## OIL LEASES AND THE APPURTENANCES THERETO.

[Circuit Court of Wood County.]

SAMUEL E. NIECE v. THOMAS PERCY.

Decided, May 5, 1906.

*Oil and Gas—Oil Lease Includes Appurtenances, When—Title to Appurtenances of Purchaser at Judicial Sale—Estoppel in Pais—Doctrine of Caveat Emptor not Applicable, When—Ambiguous Decree of Sale—Meaning of the Word "Lease" as Used in the Oil Field—"Plant" as Applied to Appurtenances—Ignorance of Rights—Evidence—Words and Phrases—Title.*

1. While it is true that in the oil field the word "lease," when referring to a lease in operation, means the whole plant—that is, the lease in its technical sense, together with the equipment and appurtenances in use in its operation—the title obtained by the purchase of such a lease at a judicial sale would ordinarily be limited to the terms of the decree of sale.

2. But where the purchaser was acting somewhat in the interest of the defendant owner, and was thereby relieved as between the defendant and himself from the application of the doctrine of *caveat emptor*, evidence as to the understanding between the original owner and himself at the time of the sale, as to whether the appurtenances were included with the lease, is admissible in a subsequent action by the original owner to recover from the purchaser the value of the appurtenances.

3. Where the evidence gies to show that there was such a community of interest between the original owner and the purchaser, and that the understanding between them was that the appurtenances as well as the lease proper was being sold, the original owner will be estopped from thereafter claiming that the purchaser took only the bare lease under the decree of sale; and this is true without regard to his ignorance of the possible fact that the sheriff would be unable to convey title to the appurtenances.

PARKER, P. J. (orally) ; WILDMAN, J., and HAYNES, J., concur.

This case comes into this court on error. Mr. Niece was plaintiff and Mr. Percy defendant in the court of common pleas. The action was brought to recover a money judgment, the amount claimed being sixteen hundred and fifty-five dollars, instituted on account of the alleged conversion by Percy of certain prop-

erty of which Niece alleges in his petition he was the owner. The property consisted of certain equipment on oil leases, being three derricks, 1,125 feet of 5⅝-inch casing; 3,700 feet 2-inch pipe; 3,700 feet sucker rods; one 25-horse-power boiler; two steam engines; one 250-barrel tank; one 100-barrel tank; 1,000 feet of 2½-inch line pipe; 500 feet 20-inch pipe; 3,000 feet 1-inch pipe; one boiler; 1,000 feet of shackle rods, and possibly some other equipment. It is averred that this property was of the value which justified the prayer for judgment for the amount stated.

As I have said, this property consisted of the equipment of certain oil leases, situate in Hancock county. It is averred that these were sold under a foreclosure sale, and that Mr. Percy was the purchaser. It was sold as the property of Mr. Niece. Mr. Niece was formerly the owner of the leases and equipment, and it was sold under incumbrances on account of debts contracted by Niece. It is claimed by Niece that the decree and the sale did not carry the title of this property to Percy; that all Percy took under the decree of sale was the right that the lessee took under the decree of sale, or the right that the lessee and assigns had acquired from the lessor, to-wit, the leasehold interest; that he took no part of the equipment.

It is contended on behalf of Percy that he purchased at sheriff's sale the equipment of the leases as well as the leasehold interests and he bases his claim upon three distinct propositions or grounds: First, that the decree by its terms covered this equipment; second, if the decree standing unexplained did not by its terms cover the equipment, that the testimony of witnesses showing the meaning of the word ''lease'' as used in the decree and order of sale, etc., and showing that in the oil field among men acquainted with the business of dealing with leases, that the word ''lease'' is understood to cover the equipment, and by reason of these explanations and this testimony, that the decree and order of sale carried the equipment; third, it is contended that Niece is estopped from claiming this equipment by reason of certain acts on his part which induced Percy to purchase under the belief that he was acquiring the equipment as well as the leasehold interest.

We are not prepared to hold that under the terms of the decree, even as explained by the testimony of witnesses touching the use of the word "lease" among oil men or in the oil field, and in the absence of the element of estoppel *in pais,* that a sale would cover the personal property on the lease, though we are well satisfied that the word "lease" as used in the oil field commonly covers the equipment. The decree itself is not free from ambiguity. The journal entry sets forth that the parties appeared with their attorneys, and the matter was submitted to the court upon the pleadings and the evidence, and upon consideration whereof and being fully advised in the premises, the court has found on the eighth day of December, 1900, that S. E. Niece was the owner in fact of the described oil and gas leases, together with the appurtenances thereunto belonging, including all oil wells located thereon, all boilers and engines, tanks, tools, pipes and other oil well appliances, to-wit: (and then the leases are described; that is to say, the land covered by the leases); so that in that part of the decree the court appears to be treating the equipment of the leases as an appurtenance thereto; and further along in the decree it is said "that said leasehold interest and property thereon were also transferred to said First National Bank, etc.; and again it is set forth that Niece entered into an agreement with the bank whereby Niece was to have the right to sell the oil run from said leases, and that if he failed to pay the debt of the bank, it was to run and sell the oil, the division orders therefor to be transferred and assigned by Niece to said defendant bank, and to sell said leases and the property situate thereon as aforesaid to satisfy and pay the indebtedness due from said Niece to said bank. When it comes to the part of the decree authorizing the sale of the property, it reads as follows:

"It is therefore considered, ordered and adjudged that unless the defendant, Samuel E. Niece, pay said sum of nine thousand eight hundred fifty-three and 54-100 dollars ($9,853.54) with eight per cent. interest thereon from the eighth day of December, 1903, within three days from this date, that an order of sale issue directed to the sheriff of Wood county, Ohio (part of the property being in Wood county), and to the sheriff of Hancock county respectively, commanding them to sell said leases herein

described as located in their respective counties, and out of the proceeds arising from said sale, to pay, first, the indebtedness due said bank," etc.

I say it seems to us that the decree is ambiguous. It seems to us uncertain whether the court there meant, or whether that should be considered, that the leases therein described to be sold would include what in the early part of the decree was described as "appurtenances" of the leases.

The order under which this sale was made sets forth that the sheriff is "to proceed without delay and cause to be advertised and to sell according to law the following real estate situate in the county of Hancock and state of Ohio" (and then is described these leases without any reference being made to the appurtenances or personal property) ; and we entertain some doubt as to whether it was competent to prove, in order to fix the meaning of the terms of this decree that the word "lease" was used in the oil field in the manner that I have mentioned. But it is well settled by the authorities that where there are distinct defenses, and the verdict of the jury is general, covering all the issues, if there is no error touching a single issue, it would justify the judgment, and when it seems to be sustained by the evidence, the judgment will not be disturbed, even though there may be errors touching other issues; errors in the admission of evidence or the exclusion of it, or the charge of the court—whatever the errors. This is laid down in a number of authorities that we had occasion to collate and examine recently. I call attention to the case of *Manson* v. *The State*, 24 O. S., 590, and I cite this state case because substantially the same rule is held there, though we know there is more strictness in criminal than civil cases. I cite also the case of *McAllister* v. *Hartzell*, 60 O. S., 69; *Sites* v. *Haverstick*, 23 O. S., 626, and *Holt* v. *Lamb*, 17 O. S., 374-384.

We have no doubt but under the evidence showing the transactions, the negotiations and dealings between Niece and Percy respecting this property, with respect to this sheriff's sale of the property, that the sale as between Niece and Percy was not strictly of such adversary character as that the rule of *caveat emptor* can be invoked by Niece against Percy. It appears that

at the solicitation of Niece, Percy became the purchaser at this sale, somewhat in the interest of Niece. It crops out that Niece expected perhaps more in the way of benefits to result to him from the sale to Percy than he in fact realized; but that does not alter the fact that Percy was purchasing somewhat in the interest of Niece and at the solicitation of Niece. And in view of that which we regard as a very important fact, a fact which discloses an estoppel *in pais,* and as we believe concludes Mr. Niece, we think the evidence of what was fairly understood by Niece and by Percy in the use of the word "lease" in their talk and their negotiations and as well as in the decree, was admissible. After this decree was entered and the property was about to be brought to sale, Mr. Niece went to Mr. Percy and asked him to buy; to buy so that the property might not be sacrificed, so that it might pay a greater amount of Niece's indebtedness than it would if it were sold at a low figure, and so perhaps that there might be something left for Niece; and, as I have suggested, it may have been contemplated by Niece that he would have an opportunity to redeem, in all of which he seems to have been disappointed.

They went upon the premises; they looked at what there was to be seen, to-wit, all of this personal property which is mentioned here, this equipment, and they talked about the value of the property, and we think it is quite evident that they both took into consideration the equipment as well as the naked rights of the lessee acquired from the lessor in the written instruments. It was a lease in operation, and this equipment constituted a part of what might fairly be described as the "plant," a term applied perhaps to manufacturing institutions, but which we think may be fairly applied here, and our understanding of the matter is, and the evidence justifies the finding that in the oil field, where parties negotiate respecting a lease which is in operation, either to mortgage it or to sell it, that they consider the whole plant, all the equipment. That is the rule unless there is some exception made; some distinct understanding to the contrary.

On the date of the sale the testimony tends to show, and we think fairly establishes the fact, that the sheriff notified the

bidders, including Mr. Percy, that the sale would carry, not only the leasehold interest, but would carry the equipment; that the equipment was to be sold as part of the lease or with the lease, and Mr. Niece at the time was present, and as the bidding progressed, Mr. Niece urged Mr. Percy from time to time to raise his bid, and prevailed on him to raise his bid several hundred dollars. It is said by Mr. Percy, and we think it is unquestionably true, that if he had not understood that the equipment was being sold with the leasehold he would not have bid as high as he did.

After purchasing, Mr. Percy paid for the property. He then, in company with Mr. Niece, went upon the property. Mr. Niece at the time he went upon the property after the sale in company with Mr. Percy called attention to some padlocks, articles of small value, that he desired to have and keep, and Mr. Percy consented to his taking them. Mr. Niece at the time made no claim to anything more; did not make any claim to any of this property until months after this sale. It is said, however, that these things occurring after the sale could not give rise to estoppel, and that is probably true, and I mention this only as indicating the understanding that Niece had of what occurred at the sale and as corroborative of the testimony of Mr. Percy that there was talk about the equipment going with the leasehold interest, and that it was understood between him and Mr. Niece that such was the case.

Upon the question of estoppel arising in this case we think the case of *Smiley* v. *Wright,* in 2 Ohio, p. 306, is in point. The syllabus reads:

"Widow entitled to dower present at the sale under order of court, and  asserts that the sale may be made free from dower, in consequence of which the price is increased, is thereby barred of dower, although the purchaser was not ignorant of her title."

And in the opinion by the court, this explanation with the facts is given:

"The next question made is whether the circumstances attending the sale of the premises to Hartford are such as bar Mrs. Smiley, in equity, from claiming her dower. The evidence upon this part of the case is clear, explicit and uncontradictory.  J.

Eddington testifies that he attended the sale as agent of Hartford. The property was put up, subject to the widow's dower, and that it was bid up to about two thousand four hundred dollars. Fickas, after the property had been cried for some time at that price, and it was evident no greater bid could be obtained, expressed his unwillingness to have it sold for that price, and, at his request, the biddings were suspended, to enable him to consult with the widow, and ascertain if she would agree to have the property sold free of dower. Fickas and the widow went into a back room, where they were engaged some time in conversation, no part of which he heard. The witness was near the door of the room, and when they came out, Fickas observed she had agreed to have the property sold free of dower. This was proclaimed at the front door by the crier; the biddings resumed and the property struck off to witness, as the agent of Hartford, at about three thousand dollars. He would not have given over two thousand four hundred dollars had he not have understood that the widow relinquished her dower. R. Moor's testimony is to the same effect. S. Salmon states he was the auctioneer. The widow was present and must have heard him cry the sale as free from her claim of dower and that the property was sold as unincumbered by any right of dower, and that J. Worstell states he was present at the sale. Mrs. Smiley was standing in the door, the auctioneer being on the step, when it was struck off. That he heard the auctioneer frequently state that the sale was free from dower, while she was in a situation she must have heard him; and she occasion replied to him that she had no claim to dower.

"It is apparent from this testimony, which is altogether uncontradicted, that after the suspension of the sale it was understood by the persons attending that the property was to be sold unincumbered by the widow's dower. That she was present, aiding by her acts and declarations, in confirming this opinion, and that the purchaser was thereby induced to bid about six hundred dollars more than he would otherwise have given."

Of course it will be recognized that the important point here is that the widow encouraged the bidders to believe that they were purchasing free from her dower. What the auctioneer said would have been unimportant had it not been ratified by the widow; and in the case at bar, whatever the sheriff said is of little importance. The question is, what was understood between Mr. Niece and Mr. Percy and what did Niece give Percy to understand? Continuing, the court say:

"It is a well established principle in equity that if a person having a right to an estate permit or encourage a purchaser to buy it of another, the purchaser shall hold it against the person who has the right. [Authorities cited.] It is contended, on the part of the complainants, that the acts and declarations of Mrs. Smiley, at the time of the sale of the lots in question, ought not to bar her of the aid of a court of equity, because she was not at that time ignorant of her rights, nor can they be considered as a fraud upon the purchaser, as he had notice of the title."

And so it is urged here that the doctrine of estoppel does not apply to Mr. Niece because he had no more information as to his rights under that decree than Mr. Percy had. One was as fully informed as the other, and if strictly under the terms of the decree and order of sale the title to the personalty was not carried and would not be carried, that Mr. Niece is not estopped, but it will be observed that in this case of *Smiley* v. *Wright, supra*, by the terms of the decree the interest of the widow, her dower interest, would not have been carried by the sale. The sheriff had no authority under the decree of the court and order of sale to sell her dower interest; it was only by virtue of her declarations or her acquiescence that her dower estate was carried or extinguished and she was deprived of it.

In a case to which we are cited by counsel for plaintiff in error, the case of *Fisher* v. *Mossman*, in 11 O. S., 42, it is said in the second clause of the syllabus:

"Where a mortgage on real estate is duly executed and recorded, and the mortgaged premises are subsequently sold at sheriff's sale, under a judgment in favor of a third party against the mortgagors, obtained subsequent to the recording of the mortgage, and the mortgagee is present at the sheriff's sale, and keeps silent with respect to his mortgage—*Held:* That the mortgage being duly recorded, and there being no other evidence of actual fraud, the mortgagee is not estopped, by his mere silence, from afterwards claiming the benefit of his mortgage lien."

But in that case, as disclosed by the opinion, the mortgagee said nothing, and there was no declaration in his presence that the property was being sold free from incumbrances, or that any mortgage that he appeared to have upon the premises had been paid or was not a valid lien, or anything of that sort. No men-

tion was made of the mortgage, and he was not called upon to speak touching his mortgage, and as said by the court on page 47:

"If the mortgagee had said or done anything to deceive or mislead the purchaser, or if, on being interrogated in respect to his rights or claims, he had then deceitfully kept silent, the case would be very different from what it now is."

We are also cited to a case in the 47 O. S., page 366, *Pennsylvania Co.* v. *Platt,* the 3d paragraph of the syllabus of which reads:

"In order to estop an owner from asserting title to his property, by his declarations or conduct, it must appear that he was, at the time, apprised of the true state of his title; that he knew, or had reason to believe, his declarations or conduct would be acted upon by another; that they were acted upon by such other person in ignorance of the title, and that such person will be injured by allowing the truth of the admission by the declaration or conduct so acted upon by him to be disproved."

But that case upon its facts was widely different from the case at bar, and in that case the Smiley case in the 2d Ohio is reviewed and approved. The authority of that case has never been questioned, and has stood as the law of the state for a great many years, and we are of the opinion that the ignorance of title mentioned in the case of *Penna. Co.* v. *Platt* is a very different thing from the alleged ignorance of Mr. Niece touching his rights in the premises here. Mr. Niece knew all that it was essential for him to know in order that he might estop himself. It was not necessary that he should know that, technically, the title to this property would not be conveyed by the sheriff; it was enough for him to know that he was the owner of this property and that he knew subject to the incumbrances and subject to the decree, and with that knowledge he encouraged Mr. Percy to believe that that property was being sold at that sale. He acquiesced in it being done, and we think that he is clearly bound under the doctrine of estoppel.

The judgment of the court below will be affirmed.

*Seney & Seney,* for plaintiff in error.

*Baldwin & Harrington,* for defendant in error.